875 P.2d 803

**STATE of Arizona, Appellee,**

v.

**Oscar Gonzales MEDINA, Appellant.**

**No. CR–91–0120–AP.**

Supreme Court of Arizona,
En Banc.

June 21, 1994.

Grant Woods, Atty. Gen., Phoenix by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Bruce M. Ferg, Asst. Atty. Gen., Tucson, for State.

La Barge and Holmes, Tucson by Emery K. La Barge and Robb P. Holmes, for Oscar Gonzales Medina.

## OPINION

MARTONE, Justice.

A jury found Oscar Gonzales Medina (Medina) guilty of premeditated first degree murder and theft, and the court sentenced him to death. Pursuant to Rules 26.15 and 31.2(b), Ariz.R.Crim.P., and A.R.S. § 13–4031, the murder conviction and death sentence were automatically appealed to this court. Medina does not appeal from the theft conviction. Because Medina's federal Confrontation Clause rights were violated, and the error was not harmless, we reverse his murder conviction and remand for a new trial.

## I. BACKGROUND

Medina and Tomas Casanova were clients in VisionQuest's criminal rehabilitation program for Cuban immigrants. VisionQuest operated two boarding facilities in Tucson, Lee House and SunQuest Apartments. Casanova and Medina lived at SunQuest Apartments and were friends.

Preliminary hearing testimony, admitted at trial over objection, indicated that in the late evening of February 8, 1989, Medina visited Casanova's apartment. He told Casanova that he was in "big trouble" because he may have killed a woman, and he needed money to get out of town. Because Casanova only had eight dollars, Medina decided to go to Lee House to get money from other VisionQuest clients. Casanova agreed to have a change of clothes waiting for him when he returned. While at Casanova's apartment, Medina used the bathroom sink to wash a blood stain from his tennis shoe.

After Medina left, Casanova called Pedro Nodalse, the house supervisor at Lee House. He told him about Medina's visit and confession, and he informed him that Medina was on his way to Lee House. Nodalse immediately called his supervisor, Juan Parra, who advised Nodalse to detain Medina at Lee House until he got there.

Medina arrived at Lee House minutes later and told Nodalse that he was in big trouble because he may have killed a person. Upon hearing Parra's car pull up to the house, Medina fled.[1] Parra called the police.

In an effort to find Medina, the police transmitted a bulletin over the radio. A traffic officer recognized Medina's name because, earlier in the evening, he had stopped him for a traffic violation. The police checked the license plate of the Mustang convertible Medina had been driving and found that it belonged to Christine Konda.

The police went to Ms. Konda's mobile home and found her dead. She had been beaten with a rock and a lamp, and had been stabbed many times. A preliminary investigation showed that she invited a guest into her home earlier in the evening. The police could not tell whether the guest was the murderer.

Shortly after finding the body, the police received a report from an attendant at a northwest Tucson gas station that a man driving a Mustang convertible hit a parked car while racing out of the parking lot. The driver matched Medina's description. Within an hour, the police found Ms. Konda's car next to Interstate 10 north of Tucson and arrested Medina.

Medina was charged with first degree murder, theft, and burglary. Tomas Casanova appeared at the preliminary hearing and testified about Medina's visit on the night of the murder. Defense counsel cross-examined him at length. The testimony was videotaped.[2] The court found probable cause for all of the charged crimes.

---

1. Medina left Lee House on foot, but he evidently had a car parked around the corner. Although Casanova and Nodalse never saw the car, the short time it took defendant to go from SunQuest to Lee House made it apparent that he was travelling by car.

2. The lengthy cross-examination and the videotaping at the preliminary hearing are unusual.

At trial, the court found Casanova unavailable and admitted his videotaped preliminary hearing testimony. Nodalse testified in person about Medina's confession. Physical evidence linking Medina to the murder scene was scarce. Although the state proved that the blood stain on Medina's shoe matched the victim's blood, blood on his watch and in the victim's car could not conclusively be linked to the victim. Investigators were unable to find Medina's fingerprints at the crime scene. They did, however, find fingerprints that did not belong to him or the victim. No usable fingerprints were found on the rock or lamp that were used to murder the victim. The knife used to stab her was not found.

Medina testified at trial. He said he went to Ms. Konda's trailer, found the door ajar, and entered. He said she was dead when he arrived, and he panicked. He did not call the police because he thought nobody would believe him. Instead, he took her car and fled. He admitted that he told Casanova and Nodalse that he was in big trouble, but he denied confessing to the murder.

Although Medina's burglary charge was dismissed under Rule 20, Ariz.R.Crim.P., the jury found him guilty of premeditated first degree murder and theft. The trial judge found that the murder was especially heinous, cruel or depraved and that Medina had been convicted of previous crimes involving the threat or use of violence.[3] Because the aggravating factors were not offset by any mitigating factors warranting leniency, the judge sentenced him to death.

## II. ANALYSIS

A Sixth Amendment Confrontation Clause issue is case dispositive.[4] Medina argues that the admission of the videotaped preliminary hearing testimony violated his right to confront Casanova at trial because the state failed to establish with competent evidence that Casanova was unavailable as a trial witness. In response, the state argues that Medina's confrontation rights have not been violated because he received everything that the Confrontation Clause guarantees.

### A. *The Finding of Unavailability*

Between the time of the preliminary hearing and the time of trial, Casanova was incarcerated in a federal prison in Texas. Pursuant to a writ of habeas corpus *ad testificandum*,[5] federal authorities in Texas transferred Casanova to Tucson so he could testify at trial. Although originally scheduled for October 27, 1990, the trial was continued until late November. The court therefore ordered an extension of the writ until December 15. The trial started on November 20, 1990.

Just after the trial began, the prosecutor learned that Casanova was no longer in custody in Pima County. The judge granted the prosecutor's request for a hearing to discuss this predicament. Because the hearing is

---

Although the record contains nothing to explain the videotaping, it contains some possible explanations for the cross-examination. During the cross-examination of another witness, defense counsel stated, "I have a right to full cross-examination at this time because if the witnesses are unavailable for trial this could be their trial testimony." (R.T. of March 20, 1989, Preliminary Hearing at 24).

3. The state concedes that the trial court improperly used Medina's prior convictions as an aggravating factor because the crimes, by definition, could be committed without the threat or use of violence. *See State v.. Bible*, 175 Ariz. 549, 604, 858 P.2d 1152, 1207 (1993). Thus, if we were to have affirmed Medina's conviction, we would have had to vacate his death sentence and either reweigh or remand for reweighing. *Id.* at 606–09, 858 P.2d 1152, 1209–12.

4. Medina does not rely on the Arizona Constitution. We therefore do not address whether the admission of videotaped prior testimony violates the Arizona Constitution. Medina also does not challenge the admission of the preliminary hearing testimony as violative of Rule 19.3(c), Ariz. R.Crim.P.

5. The common law writ of habeas corpus *ad testificandum* is used to secure the attendance of an incarcerated witness. *See Bolender v. State*, 422 So.2d 833, 835 (Fla.1982). Its use has largely been superseded by statute. *Id.* For example, 28 U.S.C. § 2241(c)(5) provides for the securing of federal prisoners where their testimony is necessary in state or federal court, as here. A.R.S. § 13–4075 provides the process by which Arizona courts may compel the presence of witnesses incarcerated in Arizona. A.R.S. § 13–4093 provides the procedure for compelling another state's prisoner to appear in an Arizona criminal proceeding.

critical to the issue of unavailability, we reproduce it here:

MS. MAYER (For the State): As I indicated last week on the second day of trial when I called the jail in order to facilitate a transport order on Mr. Casanova, my office was informed that he was no longer in custody.

Victor Marmion, an investigator with my office, made the requested follow-up phone calls to find out what happened. He was told by jail personnel that the federal agents, the marshalls [sic] from Big Springs, Texas where Mr. Casanova had previously been incarcerated, had come on November 11th to pick him up and take him back.

The State had filed a writ in early October, a petition for writ of habeas corpus with Texas for the presence of Mr. Casanova, that writ was signed by the Court and it requested that he be here for the first trial date which was originally set for October 27th. And that he remain here until the 15th of November.

When it became clear that we were not going to go to trial on October 27th, we were going to go sometime in November, I asked Your Honor to order the jail personnel to hold him until December 15th so he would be assured to be present when this trial was going to go.

Not only did they, did the federal marshalls [sic] come and pick him up in contravention of your direct order, they picked him up in violation of the time parameters set forth in the writ since he had until November 15th to be here.

Victor Marmion followed up with Cindy Post from the sheriff's office's extradition unit who indicated it would take at least two weeks to bring him back to Tucson. And that information was corroborated by Ricky Mason who is the extradition person in my office. And I will file with the Court Mr. Marmion's handwritten note about that conversation. Subsequent to that I informed the Court of what was going on and I executed a new writ which Your Honor signed which has been signed by the clerk.

However, we can get the writ to the Bureau of Prisons in Big Springs, Texas by Federal Express by tomorrow, and I am informed from Officer Robertson, Walter Robertson who is in charge there that he may or may not be able to release him pursuant to that writ. He said however that he will of course not make any transportation arrangements, the sheriff's office would have to do that.

So I contacted the officers in charge of transportation. And I spoke, my office or my secretary spoke to Paul Wilson who said there are no pilots available this week to go to Big Springs, the earliest they are going is next week, even then they don't know when that would be, even then there is no guarantee that the federal authorities would act in accordance with the new writ even if we were to federally express it to them.

I think the State's in a position of asking the Court either for a continuance of this matter to next week when we can secure Mr. Casanova's appearance, which even then may not be guaranteed; or to allow the State to proceed with the preliminary hearing testimony of Thomas Casanova.

\*       \*       \*       \*       \*       \*

THE COURT: Fred, do you want to say anything?

\*       \*       \*       \*       \*       \*

MR. DARDIS (For the Defendant): Your Honor, under rule 804 of the Arizona Rules of Evidence, under a case called *State versus Robert Edwards*, 136 Arizona 177, [665 P.2d 59,] a 1983 case, this witness is not unavailable, for purposes of invoking the 804 exception to allowing the preliminary hearing transcript to be used against Mr. Gonzales Medina.

This man can be brought. Everyone knows where this man is. There's no question, we should take it as a given fact, we know this man is in federal custody and that he could be brought here.

\*       \*       \*       \*       \*       \*

MR. DARDIS: [W]e're interested in whether Mr. Medina is going to be able to face and confront under the sixth amendment one of his accusers, and this accuser

is going to testify to some very damaging testimony. In this preliminary hearing.

Number one, that will not be able to be objected to because it is a cold preliminary hearing record.

Number two, at the time the preliminary hearing occurred, Mr. Hippert, who was my partner, who did the cross examination was without benefit of significant investigation, knowledge, research about what the entire case was about, the thrust of the investigation and various other aspects, scientific evidence which will be introduced which should have been gone into at the time Mr. Hippert examined Mr. Casanova.

Thirdly, the transcript contains certain hearsay statements by Mr. Casanova which I don't know whether they have been excised.

Fourthly, I don't think the government has met its burden of showing that this witness is so unavailable that you should invoke the 804 provisions and therefore I would ask the Court to deny the government's use of the preliminary hearing transcripts.

\*     \*     \*     \*     \*     \*

THE COURT: Well, 804 says if he's unavailable and the proponent, the State is unable to do it by process or other reasonable means it is a clear exception under the hearsay rule.

MR. DARDIS: No, I don't think so, Your Honor. The fact is you have a process established, I mean this guy is in federal custody. He's not objecting to coming as I understand it. I don't think there is any evidence that he has put up an objection under the witness provision. That may be. That may be a different situation. All they have to do is, it is their witness, use the extradition procedure, send somebody over there to bring him back.

THE COURT: They did.

MR. DARDIS: And they took him back and now they can go get him again.

THE COURT: Are you objecting to a continuance, too?

MR. DARDIS: No, Your Honor.

THE COURT: Well, frankly I feel under the circumstances they are entitled to use the preliminary hearing transcript.

\*     \*     \*     \*     \*     \*

THE COURT: The motion to use the preliminary hearing transcript is granted.

### B. *The Confrontation Clause*

The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, requires "that in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The right, however, is not absolute. The Court long ago decided that the right of a defendant to face his accusers "must occasionally give way to considerations of public policy and the necessities of the case." *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895). The Court thus recognized the necessity of admitting the prior testimony of a witness who testified at a first trial, but died before the second trial, an illustration of undisputed witness unavailability.

The case before us presents a claim of witness unavailability. We are thus not presented with a firmly rooted hearsay exception that does not require witness unavailability, as in *White v. Illinois,* 502 U.S. 346, 351, 112 S.Ct. 736, 741, 116 L.Ed.2d 848 (1992) ("unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding"). Nor is this a case like *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), which dealt with in-court procedures constitutionally required to guarantee a defendant's confrontation rights once a witness is testifying. The limitations imposed by the Confrontation Clause for in-court procedures are separate from the "requirements the Confrontation Clause imposes as a predicate for the introduction of out-of-court declarations." *White v. Illinois,* 502 U.S. 346 at 354, 112 S.Ct. at 744.

The admission of preliminary hearing testimony at trial is expressly governed by *Bar-*

ber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Each case specifically involved the issue of the admission of preliminary hearing testimony at a subsequent criminal trial. In *Barber*, the preliminary hearing testimony of a witness, who at the time of trial was incarcerated in a federal prison in Texas, was admitted in a defendant's Oklahoma state trial. As here, the prosecutor failed to ask the federal court in Texas to issue a writ of habeas corpus *ad testificandum* under 28 U.S.C. § 2241(c)(5). The prosecutor also failed to ask the state court for such a writ, even though it was the policy of the United States Bureau of Prisons to permit federal prisoners to testify in state court criminal proceedings pursuant to state writs. *Barber*, 390 U.S. at 724, 88 S.Ct. at 1321. In holding that it was error to admit the preliminary hearing testimony, the Court said:

> [A] witness is not "unavailable" for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial.

*Id.* at 724–25, 88 S.Ct. at 1322.

In contrast, in *Ohio v. Roberts*, 448 U.S. 56, 73–75, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), the Court upheld the admission of preliminary hearing testimony at a defendant's trial where the witness could not be found and her whereabouts were unknown. The prosecutor issued five separate subpoenas, but despite diligent efforts, did not even know the state in which the witness resided. The Court said:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the

declarant, the obligation of good faith *may* demand their effectuation.

*Id.* at 74, 100 S.Ct. at 2543.

The Court distinguished *Barber* as a case in which "the prosecutor knew where the witness was, procedures existed whereby the witness could be brought to the trial, and the witness was not in a position to frustrate efforts to secure his production." *Id.* at 77, 100 S.Ct. at 2544.

We now turn to this case.

### C. Evidentiary Showing of Unavailability Required

■ Medina first argues that, in relying on avowals alone, the state failed to satisfy its evidentiary burden of proving Casanova's unavailability.[6] To satisfy its burden of proving good faith efforts under *Roberts*, 448 U.S. at 74–75, 100 S.Ct. at 2543, the state should make "an actual showing through competent evidence, sufficient to convince the court that the witness *in fact* cannot be produced." *State v. Alexander*, 108 Ariz. 556, 562, 503 P.2d 777, 783 (1972). We agree that the state failed to meet this burden.

Aside from her unsworn avowals, the prosecutor offered to file one handwritten note for the record. We recognize that in deciding questions of admissibility under Rule 104(a), Ariz.R.Evid., the trial court is not bound by the rules of evidence, and thus the prosecutor's avowals were properly considered. Nevertheless, the trial court should have required more. Affidavits or testimony from sheriff's deputies and federal authorities in Texas would have been helpful. Vigorous examination of the prosecutor by the judge about her use of all available processes, state and federal, would have helped. None of this was done. The prosecutor's assertions were insufficient to satisfy the burden articulated in *Alexander*.

### D. Confrontational Unavailability

Medina argues that, in all events, Casanova was not "unavailable" for confrontation

---

6. The state asserts that Medina is precluded from raising this issue because he did not object to the prosecutor's avowals at trial. Although defense counsel did not specifically object to the exclu-

sive use of avowals, he did object to the state's failure to satisfy its burden of proof. The issue is therefore preserved.

purposes. The state argues that the prosecutor indeed made good faith efforts, but those efforts were thwarted by federal authorities.

■ An absent witness is unavailable within the meaning of Rule 804(a)(5), Ariz. R.Evid., when the declarant's attendance cannot be procured "by process or other reasonable means." The unavailability requirement under the Confrontation Clause is at least as strict as that under hearsay principles.[7] Thus, the prosecutor must use existing formal procedures for obtaining the presence of witnesses before a court may conclude that the prosecutor made a good faith effort. *See State v. Ray*, 123 Ariz. 171, 173, 598 P.2d 990, 992 (1979) (prosecutor did not make good faith effort when Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings not used); *State v. Mokake*, 171 Ariz. 179, 180, 829 P.2d 1225, 1226 (App.1991) (prosecutor who failed to use formal procedures for obtaining witness from Lesotho did not make good faith effort).

Here, although the state moved for a second writ of habeas corpus *ad testificandum* and a second writ was prepared, it was not served upon the federal authorities in Texas. It was not served because the prosecutor implied that the authorities might not honor a second writ. Yet, it is the policy of the United States Bureau of Prisons to permit federal prisoners to testify in state court criminal proceedings pursuant to writs of habeas corpus *ad testificandum* issued by the state. *Barber*, 390 U.S. at 724, 88 S.Ct. at 1321. Even if the state writ were not honored, the state could have unequivocally secured Casanova's presence through a petition to the federal district court. 28 U.S.C. § 2241(c)(5); *see also Stone v. Morris*, 546 F.2d 730, 737 (7th Cir.1976). If the prosecutor had reason to doubt the efficacy of a second state writ under these unique circumstances, she had an obligation to seek a federal writ.

We are not persuaded by the state's argument that the prosecutor's original effort to produce Casanova, pursuant to the first writ, satisfies the state's burden of making a good faith effort. Affirmative measures must be taken if there is a possibility, albeit remote, of successfully producing the declarant. *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543. Because it was virtually certain that Casanova could be produced with more effort, the prosecutor was required to undertake that effort.

For these reasons, we hold that Casanova was not unavailable for confrontation purposes. We are not unmindful of the problem presented to the trial judge. It was the third day of trial and somebody removed one of his witnesses from jail. But the trial was likely to last 10 days. There was no showing that the witness had to be produced right then and there. The order of witnesses could have been juggled. If necessary, the trial could have been continued from day to day. Indeed, the prosecutor asked for a continuance and Medina did not object. The trial judge could have called his federal counterpart in Texas and explained that a key witness in a capital trial had been whisked away from custody. It is likely that, with cooperative efforts, the federal judge in Texas would have granted immediate relief to get the witness back.

We realize that, in the heat of trial, it is not always easy to think of such things. But the burden is on the state to prove unavailability and, in a capital case, no stone should have been left unturned.

### E. *Unavailability As An Absolute*

■ The state argues that unavailability is not required in all cases and should not be required here because the hearing was videotaped and defense counsel engaged in extensive cross-examination. Therefore, the state contends, Medina received everything that the Confrontation Clause guarantees.

The state's argument has some appeal. Medina attended the preliminary hearing and was able to confront Casanova. Casanova underwent significant cross-examination.

---

**7.** Commentators suggest that, even if the Confrontation Clause and the hearsay rule are coextensive, a prosecutor will likely have a more rigorous standard for establishing unavailability than civil litigants. *See* 2 *McCormick on Evidence* § 252 at 128 (4th ed., 1992).

The jurors saw it—they did not just read it. It is not clear whether Medina was prejudiced in fact. If this case could properly be decided under *Maryland v. Craig*, Medina probably received the "essence of confrontation." [8] But, unlike *Craig*, this is not a case involving in-court procedures for a witness who is actually present. Under *Barber* and *Roberts*, unavailability is an essential ingredient of the Confrontation Clause when the proffered evidence is former testimony. We are thus powerless to adopt the state's argument. Without a proper showing of unavailability, former testimony is *per se* inadmissible under the Confrontation Clause. As the Court said in *White v. Illinois*, 502 U.S. 346, 351, 112 S.Ct. 736, 741, 116 L.Ed.2d 848, "*Roberts* stands for the proposition that unavailability analysis is a *necessary* part of the Confrontation Clause inquiry ... when the challenged out-of-court statements were made in the course of a prior judicial proceeding." (Emphasis added.)

### F. Harmless Error Analysis

■ We now must determine whether the trial court's error was harmless. Error is harmless if we can declare, beyond a reasonable doubt, that the error did not contribute to or affect the verdict. *Bible*, 175 Ariz. at 588, 858 P.2d at 1191. The question is whether, "without this evidence, the appellate court can say, beyond a reasonable doubt, that the jury would have found the defendant guilty." *State v. McVay*, 127 Ariz. 450, 453, 622 P.2d 9, 12 (1981). We find that the factors articulated in *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), for determining whether Confrontation Clause error is harmless are helpful here: the importance of the witness' testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; and the overall strength of the prosecution's case.

Casanova's testimony was an important part of the state's case. His testimony that Medina confessed to the murder was undeniably damaging, as was his testimony about Medina washing his bloody tennis shoe in Casanova's apartment. In addition, Casanova testified that Medina's hand was red and swollen on the night of the murder, indicating that Medina had been in a struggle.

We also find that Casanova's testimony was not merely cumulative of the other evidence presented. No other witnesses testified that Medina had a swollen hand. In addition, although Medina confessed to Nodalse, his confession to Casanova was not merely cumulative. Both confessions were short utterances, not in-depth accounts of the crime that included information only the murderer could know. Each confession, standing alone, contained little that could be corroborated. The nearly identical nature of the confessions, however, may have added significant credibility to both. Thus, Casanova's testimony was not cumulative.

We also note that the other evidence of Medina's guilt, aside from the confessions, was not overwhelming. To be sure, the blood stain on Medina's shoe and the fact that he was found in the victim's car linked him to the crime. But the relative lack of physical evidence and the fact that an unknown third party visited the victim's home before her murder suggest that Medina's account of the evening was not wholly outrageous. Thus, the credibility of Medina, Casanova, and Nodalse may have played a role in the verdict. Indeed, some of Casanova's testimony directly contradicted Medina's testimony. We therefore cannot declare, beyond a reasonable doubt, that Casanova's preliminary hearing testimony did not affect or contribute to the jury verdict. The error was not harmless.

### III. RESOLUTION

The trial court erred when it admitted Casanova's preliminary hearing testimony over Medina's federal Confrontation Clause objection. The murder conviction is re-

---

8. Ironically, if upon remand Casanova is unavailable, for example through death or because he is beyond the reach of process, say in Cuba, the preliminary hearing testimony can be admitted at Medina's retrial.

versed, and the case is remanded for new trial.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.